IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

IN THE MATTER OF THE SEARCH OF ) Case No.
) 
928 East 8th Avenue, ) **UNDER SEAL**
Anchorage, Alaska 99501 )
)
)
)
)
)



### AFFIDAVIT IN SUPPORT OF AN APPLICATION
### UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Sarah North, a Special Agent with the Federal Bureau of Investigation (FBI), having been first duly sworn, do hereby depose and state the following:

### AFFIANT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search a 928 East 8th Avenue, Anchorage, Alaska 99501 (hereinafter "SUBJECT PREMISES"), as described in Attachment A, for the things described in Attachment B. The United States requests authority to seize from the SUBJECT PREMISES the items described in Attachment B, which your Affiant submits constitute instrumentalities and evidence of violations of 18 U.S.C. 2113, Bank Robbery.

2. I have been a Special Agent with the FBI since July 2017. Since that time, I have been assigned investigative responsibilities in the areas of violent gangs and criminal enterprises



investigation in the FBI Anchorage Field Office, where I am currently assigned to the Violent Crimes squad. The Anchorage Field Office is located within the District of Alaska. During this assignment, I have focused on drug, violent gang, criminal enterprise, bank robbery, human trafficking, child pornography, and felon in possession of a weapon investigations.

3. During these assignments I led and participated in a large number of property crime investigations; led and participated in a large number of drug-related arrests, including buy-bust operations, reverse buy operations, and surveillance operations; and assisted in the preparation and execution of numerous search warrants and arrest warrants. The execution of these search and arrest warrants led to the seizure of firearms, ammunition, magazines, controlled substances, packing implements, United States currency, vehicles, communication devices, computers, receipts, ledger books, and other documents relating to the transportation, ordering, purchase and distribution of controlled substances, and recovery of stolen property.

4. I have become familiar with the methods commonly used by criminals in Alaska involving bank robberies. I have been involved in cases involving the investigation and prosecution of defendants for violations of Title 18 of the United States Code, specifically including §2113 Bank Robbery. Further, I have conducted and participated in a number of search warrants, arrest warrants, and interviews of people involved in bank robberies.

## INTRODUCTION

5. This affidavit is made in support of an application for a warrant to search the entirety of 928 East 8th Avenue, Anchorage, Alaska 99501, which is more particularly described in Attachment A, for the items specified in Attachment B, and to seize the items specified in Attachment B. As a result of my investigation as described below, I submit that there is probable



cause to believe that evidence of violations of 18 U.S.C. 2113, Bank Robbery (hereinafter "SUBJECT OFFENSE"), to include firearms, ammunition, magazines, United States currency, clothing, documents, and devices may be present in the SUBJECT PREMISES.

6. I am familiar with the information contained in this affidavit based upon the investigation I have conducted along with other federal, state, and local law enforcement officials. This investigation has included numerous meetings and the sharing of information with law enforcement officers and law enforcement personnel, the interview of witnesses and other persons with information, the review of interviews conducted by other law enforcement officers of witnesses and other persons with information, the review of other relevant reports, the review of video surveillance, and database searches. Based on this investigation, I submit that there is probable cause to believe that there is evidence at the SUBJECT PREMISES from the commission of the SUBJECT OFFENSE.

7. Because I submit this affidavit for the limited purpose of securing a search warrant, I have not included each and every fact known to me or the government regarding the investigation described herein. Instead, I have only included those facts necessary to establish that there is probable cause to believe that instrumentalities and evidence of violations of the SUBJECT OFFENSE may be located in the SUBJECT PREMISES.

## RELEVANT STATUTES AND REGULATIONS

8. The relevant statutory authority and terms used in this affidavit and its attachments are described and defined below.

9. This search warrant seeks instrumentalities, contraband, and evidence of violations of the following:

3



a. Title 18, United States Code, Section 2113(a), which states: "whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; or whoever enters or attempts to enter any bank, credit union, or any savings and loan association, or any building used in whole or in part as a bank, credit union, or as a savings and loan association, with intent to commit in such bank, credit union, or in such savings and loan association, or building, or part thereof, so used, any felony affecting such bank, credit union, or such savings and loan association and in violation of any statute of the United States, or any larceny- shall be fined under this title or imprisoned not more than twenty years, or both."

b. Title 18, United States Code, Section 2113(b), which states: "Whoever takes or carries away, with intent to steal or purloin, any property of money or any other thing of value exceeding $1,000 belonging to, or in the care, custody, control, management, or possession of any bank, credit union, or any savings and loan association, shall be fined under this title or imprisoned not more than ten years, or both.

c. Title 18, United States Code, Section 2113(d), which states: "Whoever, in committing, or attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person

4



by the use of a dangerous weapon or device, shall be fined under this title or imprisoned not more than 25 years, or both.

d. Title 18, United States Code, Section 2113(f), states: "As used in this section the term "bank" means any member bank of the Federal Reserve System, and any bank, banking association, trust company, savings bank, or other banking institution organized or operating under the laws of the United States, including a branch or agency of a foreign bank (as such terms are defined in paragraphs (1) and (3) of section 16(b) of the International Banking Act of 1978), and any institution the deposits of which are insured by the Federal Deposit Insurance Corporation."

## FACTS SUPPORTING PROBABLE CAUSE

### *Background of the Investigation*

10. At all times relevant to this affidavit, Wells Fargo Bank, N.A., was an institution whose deposits were insured by the Federal Deposit Insurance Corporation (FDIC).

### *Robbery of Wells Fargo*

11. On December 4, 2019, at approximately 2:30 p.m., the Wells Fargo Bank branch located at 5740 Debarr Road, Anchorage, Alaska was robbed by two masked subjects, one of whom brandished a firearm. The subjects stole $2,624 in cash.

12. At approximately 2:30 p.m. the two subjects entered the north entrance of the bank, one had a shotgun in his hand and the other had a multi-colored bag. The first subject appeared on video surveillance from the bank as a male, approximately 6' in height, medium build, wearing a black beanie hat, black bandana over his face, black zip up jacket with hood, and black gloves.

5



This subject carried the multi-colored bag, into which both subjects put money obtained throughout the robbery. The second subject appeared on video surveillance to be approximately 6' to 6'2" in height and also medium build. The second subject was wearing a black beanie hat, blue bandana over his face, grey zip up jacket, sunglasses and black gloves. This subject had the shotgun throughout the entire robbery. As the subjects entered the bank, they encountered a security guard and the bank manager who they ordered back inside, and then to get on the ground.

13. While walking toward the teller window, the first subject shoved an elderly male customer who fell to the ground and started to bleed from his head. The first subject continued to the teller window, pushed a female customer out of the way, and began yelling at the teller as he shoved a bag under the glass toward the teller.

14. The subject at the teller window told the teller to "Give me the money. Don't fucking play. Give me all the money, nigger." The subject repeated that phrase over and over.

15. The female customer whom the first subject had pushed out of the way attempted to grab that subject at the teller window, and he pushed her off. The subject then began banging on the window in front of the teller and continued shouting.

16. The teller placed $2,624 cash, without counting it, into the bag provided by the subject and handed it back to the subject. The teller then ducked behind the desk.

17. While the first subject approached the teller and demanded money, the second subject stood at the north entrance, holding the shotgun, and demanding everyone get, and stay, on the ground.

6

Case 3:19-mj-00598-MMS   Document 1-1   Filed 12/05/19   Page 6 of 15



18. The subjects began to leave, and the second subject with the shotgun struck the security guard with the gun, causing him to bleed from his head. The subjects then left through the north entrance door and got into an older model, dark colored SUV with grey trim, possibly an Explorer style. A license plate number was not observed but the witness saw the back license plate was turned upside down.

## *Identification of subjects*

19. Based on the following paragraphs the following individuals were identified as the subjects who committed the bank robbery at Wells Fargo Bank, located at 5740 Debarr Road, in Anchorage, Alaska on December 4, 2019; Totoe "TJ"/"Teehjay" Opeti Sakaria JR (hereinafter "Sakaria") and Brandon David McDonald (hereinafter "McDonald"). Each subject's name has been reported and stated in several variations but appear to refer to these two previously stated individuals.

20. On December 4, 2019, Task Force Officer (TFO) Troy Clark received still photos of video surveillance from the Wells Fargo branch of the subjects during the robbery. Several of those photos were released to the public via the press and social media for assistance identifying the subjects.

21. On December 4th, 2019, TFO Clark missed a call from Tiana M., who left a voicemail. She stated that she knew who the suspects were and identified them as Brandon McDonald and "Teehjay" Siufanua. She stated she had previously dated McDonald.

22. On December 4th, 2019 Monika Lopesi called the FBI and reported that the second subject, with the sunglasses, appeared to be a Polynesian male named T.J. Siusanua. Lopesi stated the male had recently been released from jail. Lopesi also stated the first subject standing



at the window appeared to be Brandon MacDonald, who was Lopesi's sister's ex-boyfriend. Lopesi stated MacDonald was arrested for car theft and was also recently released from jail.

23. On December 4th, 2019, an anonymous female caller called the FBI and stated that the bank robbery subject wearing the sunglasses and holding the shotgun resembled T.J. Siufanua. The caller stated the other subject resembled Brandon Macdonald. The caller said both subjects previously attended the Church of Jesus Christ Latter Day Saints where the caller's Aunt attended. The caller also stated they are members of the 20 gang.

24. On December 4th, 2019, Jeremiah Mati called the FBI and stated the man with no sunglasses was known as Brandon Mcdonald. Mati said the other subject, with sunglasses, is "Teejay aka Panda". The caller stated "Panda" stays at his brother's house at 330 South Flower Street, across from the laundry room.

25. On December 5th, 2019, TFO Clark received a phone call from a Wells Fargo bank employee who received a tip that Brandon McDonald was the subject in the photos without sunglasses, and "Tejay" or "Panda" was the other subject in the photos.

26. Local law enforcement and open source resources state that McDonald is on electronic monitoring on release with Pre-Trial Services for the State of Alaska and presumed to reside at 928 East 8th Avenue, Anchorage, Alaska. According to McDonald's electronic monitoring by Pre-trial Services, GPS coordinates placed him around the area of 5740 Debarr Road on December 3, 2019, the day before the robbery. The coordinates indicated that McDonald had been located around several different neighborhoods nearby 5740 Debarr Road. McDonald's electronic monitoring battery gave a low warning at approximately 3:30 a.m. on December 4, 2019, the day of the robbery, with the GPS location near/at 928 East 8th Avenue, McDonald's



presumed residence. The battery died a few hours later, at approximately 5:57 a.m. on December 4, 2019 and had not been restored power as of December 5, 2019.

### COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

27. As described below in Attachment B, this warrant seeks authority to search any containers located within the SUBJECT PREMISES capable of holding the items described in Attachment B. These containers include any electronic devices located within the SUBJECT PREMISES. The searching of any electronic devices located within the SUBJECT PREMISES is appropriate for several reasons. First, the search of electronic devices may allow law enforcement to identify any occupants of the premises. Second, in my training and experience, I know that individuals involved in joint criminal activity frequently communicate with one another through cell phones, instant messaging, and other social media platforms. These communications may address planning and execution of the crime, as well as attempts to evade law enforcement. In addition, while planning criminal activities, users may use internet-capable devices such as smart phones, tablets, or laptop computers to locate information about their target, such as a map of the target location and escape routes. Third, I am familiar with instances in which individuals involved in criminal activity have spoken to others through direct communications and other forms of communications, to include text messaging, instant messaging, and social media platforms, about their crimes attributes of digital evidence.

28. Searches and seizures of evidence from computers and other Internet access devices require agents to seize most or all electronic items (hardware, software, passwords and instructions) to be processed later by appropriate personnel in a controlled environment.

9



29. Searching digital evidence systems for criminal evidence requires experience in the computer and cellular telephone field and a properly controlled environment in order to protect the integrity of the evidence and recover even "hidden," erased, compressed, password-protected, or encrypted files. Since digital evidence is extremely vulnerable to tampering or destruction (both from external sources and from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

30. Computers and other digital communications devices contain volatile memory that contains information only while the device is in a powered on and/or running state. I know that powering off the device may result in the loss of the volatile information. Adding an external evidence storage device will cause minor changes to the state of the computer but will allow for the best effort in fully capturing the state of the running evidence. This capture of information requires technical expertise to ensure the resulting data can be examined by all subsequent investigators. This captured information may include current and recent use of the computer, use of encryption, use of other communications devices, routes of Internet and other digital communications traffic and passwords, encryption keys or other dynamic details relevant to use of the system.

31. Law enforcement personnel trained in searching and seizing computer data will seize items of evidentiary value, and transport the same to an appropriate law enforcement laboratory for off-site review. The electronic media will be reviewed for the evidence described in Attachment B in accordance with and as defined by the review protocols described below.

32. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded



onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space - for long periods of time before they are overwritten. Files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. The search for these files and file fragments can take considerable time, depending on the computer user's practices.

33. I know from training and experience that computers or other digital devices used to access the Internet usually contain files, logs or file remnants which would tend to show ownership and use of the device, ownership and use of any external devices that had been attached to the computer or other digital devices, as well as ownership and use of Internet service accounts used for the Internet or cellular data network access.

34. I know from training and experience that digital crime scenes usually include items or digital information that would tend to establish ownership or use of digital devices and Internet

11



access equipment and ownership or use of any Internet service or digital cellular service accounts used to participate in the exchange, receipt, possession, collection or distribution of child pornography.

## SPECIFIC METHODS OF SEARCHING FOR DIGITAL EVIDENCE

35. I am seeking authority to search for, among other things, items containing digital data, more particularly described in Attachment B. Consistent with Federal Rule of Criminal Procedure 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

36. The search of a computer hard drive, cell phone, or other computer storage medium is a time-consuming manual process often requiring months of work. This is so for a number of reasons, including the complexity of computer systems, the multiple devices upon which computing can take place, and the tremendous storage capacity of modern day computers, and the use of encryption or wiping software. I know from my training and experience, and from my discussions with trained computer forensic examiners, that a review of such quantities of evidence can take a significant amount of time. Second, there is a limited pool of personnel capable of conducting a forensic examination. Third, in some instances an individual may utilize encryption software or other publically-available techniques such as wiping software to hide their activities. Forensic tools are available to circumvent some of these techniques; however,



these tools may require a significant allocation of resources and a substantial period of time. With rare exception, searches will not be performed on original digital evidence. Instead, I know that the first priority of a digital evidence forensic examination is the preservation of all data seized. As such, original digital media will be, wherever possible, copied, or "imaged," prior to the start of any search for evidence. The copy will be authenticated digitally as described in the paragraph below.

37. I know that a digital forensic image is the best possible copy that can be obtained for a piece of digital media. Forensic imaging tools make an exact copy of every accessible piece of data on the original digital media. In general, the data contained on the original media is run through a hashing algorithm as described above, and a hash value for the entire device is generated. Upon completion of the imaging process, the same hash algorithm is run on the imaged copy to insure the copy is an exact duplicate of the original.

38. In the event that a piece of digital media is found not to be (a) an instrumentality of the offense, (b) a fruit of the criminal activity, (c) contraband, or (d) evidence of the offenses specified herein, it will be returned as quickly as possible.

## SEALING REQUEST

39. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing undercover investigation and not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the



Internet. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness by allowing any individuals suspecting in this case of fleeing and destroying evidence.

40. Sealing is also appropriate in this case to ensure law enforcement safety should additional searches by required or arrests ultimately result from this case. The subjects involved in this case have demonstrated a familiarity with firearms, and a willingness to use those firearms. Premature disclosure of the contents of this search warrant may alert suspects of law enforcement's efforts, placing law enforcement at risk should apprehension of those subjects be necessary.

## CONCLUSION

41. Based upon the information above, your affiant submits that there is probable cause to believe that violations of Title 18, United States Code, Section 18 U.S.C. 2113, Bank Robbery, that the items described in Attachment B are evidence and instrumentalities of the above-described violation, and that the items described in Attachment B are likely to be found in the SUBJECT PREMISES described in Attachment A.

42. I submit that this affidavit demonstrates and establishes that there is probable cause for a warrant to search the SUBJECT PREMISES described in Attachment A, and the seizure of the items described in Attachment B. I request that the Court issue a warrant authorizing a search of the SUBJECT PREMISES is described in Attachment A, for the items described in Attachment B.

Sarah North
Special Agent
Federal Bureau of Investigation

**Subscribed electronically & sworn telephonically**

~~Subscribed and sworn to before me this~~
__5__ day of December 2019

Honorable ~~Deborah M. Smith~~. **Matthew M. Scoble**
United States Magistrate Judge
District of Alaska
Anchorage, Alaska